IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA L. HARTMAN,

 *Plaintiff,*

  v.

UNIVERSITY OF MARYLAND AT
BALTIMORE,

 *Defendant.*

Civil Action No.: ELH-10-2041

**MEMORANDUM OPINION**

 Lisa L. Hartman, plaintiff, has brought suit against her former employer, the University of Maryland at Baltimore ("UMB" or "UMAB"),[1] defendant, alleging discrimination in employment on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count I); disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.* (Count II); and "for reason of absences otherwise authorized" under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq* (Count III). *See* Complaint (ECF 1).

 UMB has filed a motion for summary judgment ("Motion," ECF 28), along with a supporting memorandum ("Memo," ECF 28-1). Defendant claims, *inter alia*, that plaintiff failed to exhaust administrative remedies as to Counts II and III; failed to establish that she was performing her job satisfactorily at the time she was discharged; and failed to demonstrate a nexus between her use of FMLA-protected leave and her discharge. Plaintiff opposes the Motion (*See* "Opposition," ECF 38, and "Supplemental Memorandum In Opposition To

---

[1] Plaintiff refers to defendant as "UMAB," but I have used defendant's preferred abbreviation of "UMB," except when quoting from plaintiff's submissions.

Defendant's Motion For Summary Judgment" ("Supplement"), ECF 39).[2]  As the matter has been fully briefed, the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

### Factual Summary[3]

Plaintiff was born on April 14, 1961.  Plaintiff's Exh. A, Declaration of Lisa L. Hartman ("Hartman Dec."), ¶ 9.  From 1987 through 2008, she was employed by UMB in a "number of payroll administrative positions."  *Id.* ¶¶ 2-3.  Her most recent position was that of "Payroll Supervisor" within UMB's Division of Financial Services.  *Id.* ¶ 4.  She was hired for that position by Payroll Manager Candace Chow "over other qualified candidates…based on her previous work in UMB facilities."  Defendant's Exh. 1, Affidavit of Candace Chow ("Chow Aff."), ¶¶ 2, 6.  The parties have not disclosed Chow's age.

Ms. Hartman applied for the position of Payroll Supervisor after the vacancy was posted "[s]ometime in late 2007," occasioned by the retirement of Francine Jackson, "in the latter part

---

[2] I have also considered defendant's reply ("Reply," ECF 46), as well as the parties' numerous exhibits.

[3] The parties were afforded ample time for discovery and briefing of the Motion. Nevertheless, UMB has not provided a detailed statement of facts in its Memo.  Rather, its five-page Memo contains a "Background" section, approximately one page in length, and about two pages of legal argument.  UMB has not described its exhibits or discussed their significance, nor has it included citations to the record.  And, UMB has cited only one case, pertaining to the elements of a prima facie case of age discrimination.

Although the Opposition includes a "Background Facts" section that is more expansive than the movant's submission, plaintiff has not discussed defendant's exhibits or addressed many of the issues generated by them.  Moreover, plaintiff cites minimally to case law.

The detailed factual summary in the Opinion is derived from the Court's review of the record.  Nevertheless, "'[t]he court is not required to scour the record looking for factual disputes'" to which the parties have not directed it.  *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011) (citation omitted).

of 2007," when Jackson was "in her late 50s or early 60s." Hartman Dec. ¶ 4.[4]    Plaintiff

accepted the position "just before Christmas 2007," and began work on January 28, 2008.  *Id.* ¶

5; Chow Aff. ¶ 6.  As Payroll Supervisor, plaintiff "was required to, under general supervision,

oversee the centralized processing of payroll and financial accounting system transactions for

UMB." Hartman Dec. ¶ 7.

After two days of work, on January 30, 2008, plaintiff submitted a request for leave under

the FMLA, stating that she needed time to address a "Chronic Condition Requiring Intermittent

Leave." *See* defendant's Exh. 15, Certification of Health Care Provider.[5]  On February 13, 2008,

plaintiff was notified by Claude Owens, Human Resource Services Representative, that her

"request for Family and Medical Leave (FML) has been approved on an intermittently [sic] basis

for a maximum of 480 hours for the 2008 calendar year." Defendant's Exh. 15, FML Approval.[6]

Plaintiff underwent a "surgical procedure" on February 11, 2008, apparently because of

"complications from earlier gastric surgery." Hartman Dec. ¶ 6.  She was cleared to return to

work on March 24, 2008.  *See* Defendant's Exh. 15, Feb. 21, 2003 Letter of Dr. Peter Liao;

Defendant's Exh. 15, Union Memorial Hospital "Back To Work/School" note.  Plaintiff alleges

that, "[a]s a result of her medical leave, [she] was unable to receive the additional training that

the position required and which Ms. Chow had earlier promised to [her]." *Id.*

Plaintiff observes that, during the long course of her employment at UMB, prior to

becoming Payroll Supervisor, she received no "substantive complaints about [her] performance"

---

[4] Jackson assumed the position of Payroll Supervisor before Chow became Payroll Manager; Chow did not hire Jackson.  *Id.*

[5] Because defendant's Exhibit 15 consists of a number of documents, I have identified the particular document at issue when citing to Exhibit 15.

[6] Revised FML approvals dated March 4, 2008, March 11, 2008, and August 5, 2008, are also part of defendant's Exhibit 15.  Plaintiff's later requests for leave under the FMLA are discussed, *infra*.

and "encountered no difficulty with the substance of [her] performance." *Id*. ¶ 3.  In fact, she claims to have "performed payroll administration duties with distinction, having received numerous commendations from the management of Defendant UMAB regarding [her] performance." *Id*.

In contrast, Chow maintains that Hartman "had a number of performance-related difficulties in the position of Payroll Supervisor." Chow Aff. ¶ 8.  She met with plaintiff "on as many as six (6) occasions to communicate work-related concerns about her performance: including failure to meet deadlines, poor communication, and errors." *Id*. ¶ 10.  Such "errors, problems, and continuing mistakes" included "difficulty analyzing problems which affected her ability to resolve payroll errors." *Id*. ¶¶ 8, 11.

Defendant has submitted various records that purportedly evince numerous incidents regarding plaintiff's deficient performance.  The first mention of performance-related issues appears on plaintiff's yearly performance review, dated May 23, 2008, completed by Chow.  *See* defendant's Exh. 15, "Performance Development Program (PDP Form)."  The review form listed plaintiff's "Overall Performance" as "Meets Standards," which was the middle option, above "Below Standards" and "Unsatisfactory," but below "Outstanding" and "Above Standards."  *Id*.  At the time of the evaluation, plaintiff had been working with Chow for only two months, although she had technically been in the position of Payroll Supervisor for four months.

In the written portion of the review, Chow stated that, due to Hartman's medical leave, she "had very limited time working with [Hartman] to provide an evaluation for her performance." *Id*.  Accordingly, Chow noted that the review of plaintiff's performance was the result of a "joint effort" with Gail Leach, plaintiff's former supervisor, who, Chow wrote, described plaintiff's performance as "[meeting] standards and satisfactory," but listed her

"challenges" as "not always telling the truth and taking unscheduled leave." *Id.* The review also expressed Chow's "concern about having no communication" with plaintiff regarding her March 2008 FMLA leave. *Id.*

As noted, in Hartman's Declaration, at ¶ 3, plaintiff insists that her performance prior to assuming the role of Payroll Supervisor had been exemplary. Next to the comment about Hartman "not always telling the truth and taking unscheduled leave," plaintiff wrote: "I disagree with this statement from Gail Leach…." *Id.*

On July 18, 2008, Chow and Hartman communicated extensively by email regarding errors in the "Payroll Error Message Report." *See* defendant's Exh. 3.[7] In her messages to plaintiff, Chow voiced frustration at plaintiff for the errors, writing, *id.*:

> It appears that we have to go through this communication every pay period. We went through at least 5 times verbally [and had] multiple conversations with you regarding the importance to clear off the errors on the Payroll Error Message Report daily….You promised me it would not happen again when I spoke with you about my concerns last pay period….I have not seen any improvements on your part.

In response, plaintiff apologized and asked for further assistance, stating: "I think something that would help me and something that I would really appreciate would be if Rita [Marable] and I could sit down and do the error reports together again for a few more pay periods so that I can reinforce and ask more questions as well as take better notes on making the corrections." *Id.* Explaining that she was "just asking for a little patience and understanding," Hartman said: "I do like this job and I do care about and appreciate all of your and Rita's help and I really do want to be a team member who as the payroll supervisor can do her part of the responsibilities." *Id.*

---

[7] Defendant's Exhibit 3 includes the entire "chain" of emails exchanged that day.

Six days later, on July 24, 2008, Chow wrote a memorandum to plaintiff regarding the errors in the "Payroll Error Message Report."  *See* defendant's Exh. 2, July 24, 2008 Chow Memorandum.  Chow complained that "it is felt that [plaintiff] need[s] to be supervised more closely to insure that work is being performed timely and accurately," indicated that plaintiff would be required to give daily job status reports, and warned that, "if [plaintiff's] job performance [was] found to be less than satisfactory" after a performance review in September 2008, she would "be subject to rejection on probation."  *Id.*  Plaintiff signed the memorandum, acknowledging that Chow "discussed this memo with [her] on July 24, 2008."  The form indicated that the signature "does not imply agreement or disagreement with the contents."  *Id.*

Chow also noted dissatisfaction with plaintiff's performance on August 14, 2008, after Hartman sent an email, time stamped at 5:35 p.m., to "Payroll Approvers," addressing the completion of a pay calculation.  *See* defendant's Exh. 8, Aug. 14, 2008 Email.  A printout of the email contains a handwritten annotation, presumably made by Chow,[8] stating, *id.*:

> Lisa didn't send out this email until I reminded her at 5:30 pm.  She claimed that she didn't send it out because not all [payroll adjustment] forms were entered.  However, I checked w/ Albert, Rita & Dessy, they said all [payroll adjustment] forms were in early after lunch….[Lisa] was caught not telling the truth.

Another annotation on the printout stated that the "goal is to finish entering all [payroll adjustment] forms before 2[:00 p.m.]…."  *Id.*  The note does not indicate whether the matter was discussed with Hartman.

Chow also complained about plaintiff's conduct in connection with a leave request.  On August 4, 2008, plaintiff wrote an email to Chow seeking leave on "8/6-8/11/08" and "8/20-

---

[8] The record includes several emails from Chow's email account, marked with handwritten annotations, all in the same handwriting.  Although defendant has not identified the author, the context suggests that Chow wrote the annotations.  In her briefing, plaintiff has not questioned the authorship of the annotations.

8/25/08," because she was moving to a new home.  *See* defendant's Exh. 6.  Chow responded by email the same day, stating: "Lisa, As you know, we are working on a few projects so I cannot approve all the days that you requested.  Please try to arrange your schedule for your moving. Thanks!"  *Id*.  A series of emails ensued as to the particular dates of plaintiff's leave, on which Wayne Allen, the Associate Director of the Department of Financial Services, was copied.  *Id*. Plaintiff also wrote to Allen with a "cc" to Chow and Hartman's associate, Rita Marable, as follows: "Mr. Allen, I think that I am going to need to take a vacation day on 8/25/08 also….Please let me know if this is ok with you." *Id*.  Allen responded: "OK." *Id*.

An undated, handwritten annotation, presumably made by Chow, appears on the printout of the email chain, stating: "Already have communicated w/Lisa, she could not take the week of 8/25/08 off because it's a short payroll processing cycle.  She went to my supervisor to request a day off from Wayne while I was out on vacation—insubordination." *Id*.  On September 2, 2008, Hartman wrote an email to Allen, with a "cc" to Chow, apologizing for taking leave on August 25, 2008.  *See* Defendant's Exh. 12.  She explained that she "forgot Candace [Chow] had told [her] that she did need [her] in that Monday…." *Id*.  Plaintiff commented: "Unfortunately it made it appear that I was being insubordinate but that was not my intention…." *Id*.

On August 19, 2008, Stephen Eddy, a UMB employee, emailed Chow to inform her that Hartman had run a "pre confirm audit for the wrong pay period…."  Defendant's Exh. 9, Email of Aug. 19, 2008.  Undated, handwritten annotations on the printout of the email chain, again presumably made by Chow, note that Hartman did not realize she had run the audit for the wrong pay period, but rather thought "she could not run the report successfully" and "had an error running the report" because another employee, Albert, "was running some processes" too.  *Id*.  In

Chow's view, Hartman "didn't understand" the true cause of the problem as explained by Eddy, and "always got mistakes running processes" because she "didn't pay attention." *Id*.

Another issue arose in August 2008, concerning Hartman's apparent failure to enter correctly certain forms regarding "IHV expat adjustments"; discussion of the errors resulted in two email chains that spanned several weeks. The first email chain commenced on August 13, 2008. *See* defendant's Exh. 11, "Expat Packages for IHV Employees" Email Chain. On that date, UMB employee Debi Delker emailed Chow, indicating that she had checked the payroll register, and "all the people [she] did payroll adjustments for…[were] showing up with no allowances or the old allowances and housing missing." *Id*. Chow wrote to Hartman early the next morning, stating, in part: "I told you that [Delker] would send [payroll adjustment] forms for the last [pay period] and you need to enter them in additional pay so that they don't have to submit [payroll adjustment] forms for this [pay period]. Do you remember?" *Id*. Less than twenty minutes later, Hartman responded: "It is not that I do not remember, we have the payroll adjustment forms [and] Dessy and I are looking at them they [sic] were entered by Rita and Dessy." *Id*. However, in a handwritten annotation entitled "summary of incident," Chow wrote that Hartman, not her co-workers who had entered the payroll adjustment forms, was ultimately responsible for the error, as she "didn't enter the additional pays for the employees (20 employees in total)." *Id*.

Additional errors with the "IHV expat adjustments" were discussed in a second email chain on September 9, 2008. *See* defendant's Exh. 13, "IHV Expat Adjustments" Email Chain. Chow emailed Hartman at 10:40 a.m. that day, informing Hartman that she had failed to enter the necessary information for "the last 2 pay periods," or "put them in…incorrectly," at the cost of "a lot of time to verify over and over and try to correct them in the last 4 pay periods." *Id*.

8

Chow admonished Hartman "to pay attention and double check [her] work when it is done." *Id.* In an email from Hartman to Jones, sent at 12:58 p.m. that day, with a "cc" to Delker and Chow, Hartman wrote that she was "in the process of verifying [Jones's] hardship employee/students and w[ould] be making some corrections." *Id.* She indicated that she would "notify [Jones] when [she had] corrected everything to match [Jones's] spreadsheet" and "apologize[d] for any inconveniences [the errors] may have caused." *Id.* At 1:04 p.m., Hartman sent an email to Chow, denying that she made the errors at issue, and questioning whether Chow "had someone do any thing [sic] to" the forms while plaintiff was out of the office "due to moving and [her] broken finger." *Id.* Chow responded: "Since you entered them incorrectly (got all the amounts and codes mixed up) before you broke your finger, we had to check and correct them last [pay period]. You will need to make sure they are correct this [pay period]. Thanks!" *Id.*

Via email three days later, on September 12, 2008, plaintiff was again chided by Chow regarding alleged errors Hartman had made with respect to the payroll. *See* defendant's Exh. 16. In the email, Chow alleged that plaintiff mishandled a request from a co-worker, Carla Rich, about an employee's pay adjustments. *Id.* Chow claimed to be "very surprised" by Hartman's conduct, as she had apparently instructed plaintiff as to a similar issue a "few pay periods" before. *Id.* According to Chow, she "showed [Hartman] how it should be handled," and had given her a warning that she "should never have done anything like" what she did with respect to the pay issue. *Id.* Chow expressed concern that plaintiff had, without detection, "handled" payroll issues in a "similar manner" on other occasions. *Id.* Hartman's response, if any, has not been made part of the record.

Chow lobbed more criticism at Hartman on September 17, 2008, when she emailed Marc Wasserman, Director of the Department of Financial Services, regarding plaintiff's delay in

sending out the "payroll processing." *See* defendant's Exh. 17.  Chow attributed the delay to

"Lisa's incompetence," and wrote, in part: "Lisa repeatedly cannot handle error report

independently.  I documented on the first memo about this.  This happened again last Friday that

she asked for Rita's help instead of asking me."  *Id*.  The same day, Chow wrote to Hartman

about the issue, noting that Hartman had been instructed to approach Chow, not Rita Marable, if

she had "questions on this critical error report."  *Id*.  Chow chastised Hartman stating: "Clearly,

you are not able to handle this error report independently and you tried to cover up your

shortcoming."  *Id*.  Chow continued, *id.*:

> I helped you correct the errors on the…report.  I showed you how to fix the first
> error on the report.  The third error on the report was exactly the same as the first
> one that I showed you a few minutes ago.  However, you still could not fix it.
> You are responsible in your position to fix the errors and ensure the report data is
> accurate.  However, you have not been able to do so and I have to clean up the
> report.

Later that same day, Chow wrote to Wasserman to show him a draft of an email she

intended to send to Hartman regarding an incident that had "just happened today."  *Id*.  The draft

email informed plaintiff that, per Hartman's instructions, the pay of an employee, Robert Weber,

had been adjusted in a negative amount to recover the balance of a pay advance he had

previously received, but it "was not a normal process to send in a negative adjustment for

advance recovery," and Weber's pay was ultimately docked twice.  *Id*.  Chow wrote: "As a

consequence, the employee was underpaid and angry with the department rep [sic].  The

department rep [sic] made this error was [sic] totally based on your wrong instruction/

information."  *Id*.  Wasserman responded to Chow, via email, indicating that the proposed email

to Hartman was "fine."  *Id*.  Although Chow indicated in a reply to Wasserman that she would

send the email to Hartman, *id.*, it is not clear from the record whether she did so.

Another performance issue arose on October 3, 2008, when plaintiff allegedly "sent the PI file out by mistake" before she could "FTP in the error files."[9]  Defendant's Exh. 19.  In an email to Hartman about the incident, Chow stated that the error "was a result of not paying attention to payroll processing," and she instructed Hartman to "check the [Payroll] Process Monitor daily to ensure all processes are processed timely and accurately."  *Id.*

Just one week after the incident of October 3, 2008, Chow wrote a handwritten note,[10] dated October 9, 2008, in which she observed that plaintiff had made an error in connection with a "PR Error Report."  *See* defendant's Exh. 20.  Chow stated that she alerted Hartman to the error, and that plaintiff said she would correct it, but that the manner in which Hartman attempted to correct the error was improper.  *Id.*  Apparently, Hartman "manually added" an adjustment after turning off "all regular pays," despite the "numerous times [Chow] warned her not to put or create any adjustments without a payroll adj. [sic] form from the department."  *Id.*  In Chow's opinion, plaintiff's actions "show[ed] that she doesn't understand the situation and handled it a wrong way…."  *Id.*

The FMLA leave that plaintiff took from January 30, 2008 to March 24, 2008, discussed earlier, was not Hartman's only FMLA leave during her employment with the Division of Financial Services.  On September 3, 2008, plaintiff requested one hour of FMLA leave for each of thirteen upcoming appointments with her psychologist, Dr. Russell J. Hibler; these appointments were to begin in October 2008, and she sought to leave work at 4:00 p.m. on those dates.  Correspondence of Sept. 3, 2008 Re: Hibler Appointments.  And, on September 15, 2008, plaintiff requested leave from September 15, 2008 through September 19, 2008, and submitted a

---

[9] The precise meaning of this alleged error is unclear, and illustrates the Court's earlier comments as to the shortcomings in the defendant's briefing.

[10] The note is not addressed to any particular recipient, and may have been written for Chow's records.

letter to Chow and Allen from Dr. Hibler, dated September 15, 2008, attesting that she "need[ed] to be out of work and related duties…"  *See* defendant's Exh. 15, Cover Sheet and Hibler Letter of Sept. 15, 2008.  Apparently, plaintiff was in treatment "for depression and post-traumatic stress disorder ('PTSD') arising from childhood traumas and triggered in 2008 by the death of [her] mother."  Hartman Dec. ¶ 17.[11]

By letter of October 13, 2008, Chow notified plaintiff of her "separation from employment as Payroll Supervisor."  *See* defendant's Exh. 21, Termination Letter.  The letter stated that, as plaintiff was in the first year of her employment and thus on probationary status, defendant was not required to show cause for the termination.  *Id.*  Hartman's termination was to take effect one month later, unless plaintiff chose to resign earlier.  *Id.*  Chow avers that, prior to terminating plaintiff, she "consulted with" Wasserman, Allen, and Al Fick, Director of the Department of Human Resources—Labor Relations.  Chow Aff. ¶ 12.

After plaintiff was notified of her impending termination, she took FMLA-protected leave from October 13, 2008, until November 3, 2008, pursuant to the recommendation of Dr. Hibler.  *See* defendant's Exh. 15, Letters of October 17, 21, and 27, 2008 Re: Post-Notification Leave; Oct. 22, 2008 Letter to Hartman from Nikki Bilenky, Employee/Labor Relations Specialist, Approving Leave Request.  Hartman's last day in the office was November 5, 2008, and she was terminated as of November 12, 2008.  *Id.*, "Separation Information" Email of Nov. 24, 2008 from Kisha Wilson, UMB Program Management Specialist in Employee/Labor

---

[11] In her Declaration, plaintiff avers that she "took extensive leave away from work" to deal with her "medical condition following gastric surgery…as well as [her] need to provide care for [her] mother and later events related to [her] mother's and brother's deaths…."  *Id.* ¶ 16.  She states that, "[a]t two times during the period from January 2008 through October 2008, Defendant UMAB authorized protection for [her] under the [FMLA]…."  *Id.*  The FMLA leave was granted so that plaintiff could address her gastric and mental health problems.  Plaintiff has not submitted documentation that she received time under the FMLA to "provide care for [her] mother."  *Id.*

Relations.

Plaintiff claims her termination was prompted not by the alleged performance issues recounted above, but by Chow's "unfounded criticisms" of plaintiff stemming from Chow's animus towards "older employee[s]," and as a "consequence" for plaintiff's "missing time from work." Hartman Dec. ¶ 18. Plaintiff contends: "Since the time that Ms. Chow had learned my actual age during my birthday celebration, Ms. Chow demonstrated resistance to, and difficulty with, me relating to my performance in my position as payroll supervisor." *Id.* ¶ 14. Further, plaintiff claims that Chow "took every opportunity to limit assistance that she had earlier assured that [plaintiff] would receive and to exaggerate every criticism she had of [plaintiff]." *Id.*

In support of her assertion that Chow harbored age-based animus towards plaintiff, Hartman points to two incidents.

The first incident occurred on April 14, 2008, at an office party celebrating plaintiff's forty-seventh birthday. *Id.* ¶ 9. At that time, plaintiff had been working in Financial Services for three calendar weeks, plus the two days she worked before going out on leave. Chow asked plaintiff her age, and when plaintiff told Chow "which birthday [she] was celebrating," Chow allegedly responded, "Wow. I didn't know you were that old." *Id.*

The second incident occurred in late May 2008. During the time plaintiff was out of the office, Chow had hired a temporary employee, Adesola "Dessy" Sobowale, to perform plaintiff's duties and to assist plaintiff's associate, Rita Marable. *Id.* ¶ 7. Sobowale was a "22-year-old woman right out [of] college," and she continued working after plaintiff returned from her leave. *Id.* ¶¶ 7-8. In May 2008, Chow decided to fill Sobowale's temporary position with a permanent employee. *Id.* ¶ 10. The position was publicly advertised and there were "at least seven (7) candidates for the position." *Id.* When plaintiff and Chow "discussed the qualifications of the

candidates," plaintiff expressed her preference for S.D.,[12] a woman who was "in her 50s," noting that the applicant was the "only candidate who had extensive and direct payroll experience at UMAB."  *Id.* ¶¶ 10, 11.  In her Declaration, Plaintiff described S.D. as "the oldest and most experienced of the candidates considered."  *Id.* ¶ 11.

Chow allegedly "overruled" plaintiff's recommendation, claiming that the candidate was "old," "would be slow," "would be out sick because of her age," "would be stubborn and resist learning new things," and "would not like change."  *Id.* (quotation marks omitted).  Plaintiff then recommended another woman "in her 50s," who had "prior experience in financial services at UMAB."  *Id.* ¶ 12.  Chow allegedly expressed "similar sentiments" regarding the woman's age and again rejected plaintiff's recommendation.  *Id.*  Eventually, Chow "directed" plaintiff to hire Sobowale, who was, in plaintiff's view, "the youngest and the least experienced of the candidates interviewed."  *Id.* ¶ 13.

According to plaintiff, Chow's criticism of plaintiff was similar to the concerns Chow had expressed with respect to S.D.  *Id.*  For example, Hartman alleges that Chow expressed concerns that plaintiff "could not learn" and "missed too much time."  *Id.*

The allegations in Hartman's Declaration closely mirror allegations made in the Complaint.  Therefore, Chow and defendant were on notice of the substance of plaintiff's allegations before Chow filed her Declaration in support of the Motion.  Yet, in her affidavit, Chow does not deny the interaction at plaintiff's birthday party regarding plaintiff's age.  *See* defendant's Exh. 1.  Nor does she address the age-related comments plaintiff alleges Chow made with respect to S.D. and the other applicant for whom Hartman advocated.  Indeed, she is entirely silent on whether she ever expressed age-related animus.  *Id.*

---

[12] Because the candidate's name is not relevant, and to protect her privacy, I have used only her initials.

As indicated, plaintiff also complains that she was subjected to unfounded criticism. Hartman Dec. ¶ 15. She points to the incident concerning the negative adjustment of Robert Weber's pay. *Id.* According to plaintiff, "[t]he department representative for the employee in question had sent to [plaintiff] an email complimenting [her] regarding [her] job performance." *Id.* Plaintiff also insists that she "never encountered an instance in which Defendant UMAB had ever issued a pay check to an employee for a pay period as few as 5 days after the end of the pay period" and concludes: "Ms. Chow depicted in her email complaints from a UMAB employee about a paycheck he had then not yet received." *Id.*

With respect to Hartman's argument that Chow thought plaintiff "missed too much time," plaintiff submitted, as plaintiff's Exhibit C, "Documents reflecting Ms. Chow's concerns about Plaintiff's time away from work." Most of the documents were also submitted by UMB. See defendant's Exhibits 6, 17.

One document highlights a portion of Chow's email to Wasserman on September 17, 2008, discussed, *supra,* addressing the incident involving Weber's pay. Chow wrote, in part: "By the way, just FYI—[Hartman] called in Monday and left me a message of taking a 'FMLA day' while I was on the phone. Tuesday morning, she called and told me she just faxed in a doctor's note. She would be out for the rest of the week."

The second document is the email chain that began on August 4, 2012, regarding dates for which plaintiff sought leave in order to move. As noted, Chow had a problem with plaintiff's proposed dates because they were "working on a few projects" and it was a "short pay period." The printout submitted by plaintiff has a handwritten annotation, and the context strongly suggests it was added by plaintiff. It reads: "I had to go to her supervisor in order to be approved to be off work." The third document is an email from Hartman to Allen, with a "cc" to Chow,

dated September 24, 2008, in which Hartman acknowledged: "Candace requested that no one be off this week."  Nonetheless, she requested four hours of leave to attend two job interviews.  In the email, plaintiff also noted that she had scheduled two upcoming doctor's appointments, but did not indicate that Chow had refused the request for leave for those appointments.  Rather, plaintiff stated that she "wanted to reiterate [the dates of the medical appointments] with [Allen], as well as get [his] permission to go to the job interview/s [sic]."

On August 5, 2009, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Defendant asserts, and plaintiff does not dispute, that on May 24, 2010, the EEOC issued a right to sue letter to plaintiff.  *See* Memo at 2.  However, it does not appear that plaintiff's right to sue letter has been made part of the record.  This suit followed.

In Count I, plaintiff's ADEA claim, she alleges, Complaint ¶ 24:

Defendant UMAB acted unlawfully against Plaintiff Hartman, in violation of the ADEA, by denying her, on account of her age, continued employment for which she was otherwise qualified to continue. From the date that Ms. Chow learned of Plaintiff's age, Ms. Chow subjected Plaintiff…to significantly harsher treatment than she gave to any other employee,…subjecting Plaintiff to criticism for characteristics consistent with those which Ms. Chow had directed to older employment candidate [S.D.], and…assessing Plaintiff's performance through the lens of her demonstrated bias against older workers.

In Count II, plaintiff's ADA claim, she alleges, Complaint ¶ 30:

Defendant UMAB acted unlawfully against Plaintiff Hartman, in violation of the ADA, by denying her, on account of her absences for treatment of depression and PTSD, continued employment for which she was otherwise qualified to continue. Defendant UMAB unlawfully failed to accommodate Plaintiff's doctor's visits when Ms. Chow based her termination decision in substantial on [sic] Plaintiff's absences from work because of her need for treatment.

And, in Count III, plaintiff's FMLA claim, she alleges, Complaint ¶ 34:

Defendant UMAB acted unlawfully against Plaintiff Hartman, in violation of the FMLA, by denying her, on account of her absences for treatment and other needs,

formally authorized by UMAB under the FMLA, continued employment for which she was otherwise qualified to continue. Defendant UMAB unlawfully disregarded the protection afforded her under the FMLA by terminating her employment for reasons of her authorized absences from work.

Additional facts are included in the Discussion.

## Standard of Review

Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[13] Under Rule 56(a), summary judgment is properly granted only if the movant shows that "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving the motion, the court must construe the facts and all reasonable inferences in the light most favorable to plaintiff as the nonmoving party. *See United States v. Diebold*, 369

---

[13] In its Motion, at 1, defendant also argues that it is entitled to summary judgment because plaintiff failed properly to serve defendant, pursuant to Fed. R. Civ. P. 4(j)(2). In plaintiff's view, "the Defendant's concern regarding service of process in this matter is some 8 months overdue, as Defendants have twice acknowledged the sufficiency of service, once by having filed an answer on February 4, 2011, and earlier by expressly acknowledging such service in the Defendant's Consent Motion for Extension of Time, filed in this Court on December 14, 2010." Opposition at 2. In its Reply, defendant did not respond to plaintiff's argument.

In my view, defendant has waived its right to claim that it was improperly served. A party waives its right to challenge insufficient service of process by failing to assert the defense in a pre-answer motion made pursuant to Fed. R. Civ. P. 12(b)(5), or by failing to include the defense in the answer. *See* Fed. R. Civ. P. 12(h)(1)(B); *Pusey v. Dallas Corp.*, 938 F.2d 498, 501 (4th Cir. 1991) ("[B]y failing to raise the defense…in a pre-answer motion or, if no such motion is made, then in its answer, a defendant waives that defense and submits to the personal jurisdiction of the court."). Here, defendant failed to bring a motion under Rule 12(b)(5) challenging service, and similarly failed to raise the issue of service in its answer (ECF 8).

U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007); *T-Mobile Northeast LLC v. City Council of City of Newport News*, 674 F.3d 380, 385 (4th Cir. 2012).  However, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, *supra*, 475 U.S. at 586; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson, supra*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict" for the nonmoving party, there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

## Discussion

### I.

Defendant asserts that plaintiff has failed to exhaust her administrative remedies as to Counts II and III because "her EEOC claim did not allege violations of either ADA or FMLA."  Motion at 1.  Before addressing this contention, additional facts are relevant.

Plaintiff has submitted as her Exhibit D a copy of the "Equal Employment Opportunity Commission Intake Questionnaire" (the "Questionnaire") that she completed in connection with

filing her charge with the EEOC.[14]   A "Charge #" is handwritten across the top of the Questionnaire, and the Questionnaire notes that it "may serve as a charge if it meets the elements of a charge."  On the first page of the Questionnaire, plaintiff checked both "Yes" and "No" next to the question, "Do You Have a Disability?"  On the third page of the Questionnaire, however, plaintiff checked: "Yes, I have an actual disability."  Underneath, she wrote: "emergency surgery; and have PTSD."  She also checked "Yes" in answer to the question: "Did you ask your employer for any assistance or change in working condition because of your disability?" But, in answer to "Describe the assistance or change in working condition requested," she wrote "N/A," a common abbreviation for "non-applicable."  In response to the question, "What is the reason (basis) for your claim of employment discrimination?", plaintiff marked "Age," "Disability," and "Retaliation."

As to the substance of the discrimination allegations, plaintiff identified the "Date" of the discrimination as "1/25/08 --> July 08," and described the "Action" as "Just Numerous E-Mails & harassment [sic]".  When asked the "Name and Title of Person(s) Responsible," she wrote "Candace Chow."  Plaintiff's affidavit was appended to the Questionnaire.  It is substantially similar to the Complaint and to the Hartman Declaration (plaintiff's Exhibit A).  In the affidavit, plaintiff repeatedly referred to discrimination on the basis of age, with oblique references to disability and protected leave under the FMLA.  Specifically, in ¶ 6, she referred to the FMLA leave she took from January through March of 2008 in connection with her gastric problems, and in ¶ 14 she referred to Chow's alleged comment that plaintiff "missed too much time."

---

[14] Although the Questionnaire is stamped "2009 AUG – 5," the words "filed on 8/6/09" are written across the top.  No other charging document has been made part of the record. Apparently, the Questionnaire was not produced during discovery, as plaintiff admits that she did not locate the Questionnaire until after she filed her Opposition. *See* Supplement at 2.  However, defendant does not assert that it is inadmissible.

On August 18, 2009, defendant received notice from the EEOC of plaintiff's charge of discrimination.  *See* defendant's Exh. 22, Notice of Charge of Discrimination (the "Notice").   It stated: "No action is required by you at this time."  *Id.*  Next to the phrase "Circumstances of Alleged Discrimination" on the Notice, the EEOC checked only "Age" and "Retaliation"; the "boxes" for disability discrimination or "other" discrimination were left blank.  *Id*.  The Questionnaire was not appended to the Notice.

Relying on the Notice it received from the EEOC, UMB asserts: "Plaintiff's EEOC Claim alleged violations under the ADEA (age) and retaliation….Accordingly, Plaintiff has only exhausted her administrative remedies and has received her right to sue letter on the ADEA; Counts II and III must be dismissed."  Memo at 3-4.

Plaintiff counters that she has exhausted her administrative remedies.  She asserts: "[T]he law is plain…that an action for relief under the FMLA is not an action subject to the requirement of administrative exhaustion of remedies using the EEOC…."  Opposition at 2.  And, plaintiff argues that the Questionnaire "appears to be dispositive of the issues raised by the Defendant's motion regarding the exhaustion of administrative remedies with respect to Plaintiff's claim for discrimination for disability."  Supplement at 2.

In its Reply, defendant concedes that "Plaintiff is correct that there is no exhaustion requirement to set forth a FMLA claim."  *Id.* at 2.  But, relying only on the Notice, it argues that, "*as the charging document indicates*, Plaintiff did not properly notify the EEOC of an ADA claim and is thus precluded, as a matter of law, from raising an ADA claim in this lawsuit."  Reply at 2 (emphasis added).

A "failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim," and the "same is

true of claims made under the ADEA." *Jones v. Calvert Group, Ltd.,* 551 F.3d 297, 300–01 (4th

Cir. 2009).   The ADA also "include[es] the requirement that a plaintiff must exhaust his

administrative remedies by filing a charge with the EEOC before pursuing a suit in federal

court…." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

"The scope of the plaintiff's right to file a federal lawsuit is determined by the…contents"

of the charges filed by the plaintiff with the EEOC or a corresponding state agency during the

process of exhaustion of administrative remedies. *Jones,* 551 F.3d at 300 (citation omitted).  Put

another way, "'[o]nly those discrimination claims stated in the initial charge, those reasonably

related to the original complaint, and those developed by reasonable investigation of the original

complaint may be maintained in a subsequent…lawsuit.' " *Id.* (citation omitted).   However, an

EEOC charge "'does not strictly limit a…suit which may follow; rather, the scope of the civil

action is confined only by the scope of the administrative investigation that can reasonably be

expected to follow the charge of discrimination.'"   *Miles v. Dell, Inc.,* 429 F.3d 480, 491 (4th

Cir. 2005) (quoting *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 132 (4th Cir. 2002)).

It is apparent that the EEOC's Notice, on which UMB relies, failed to apprise defendant

of the totality of plaintiff's claims.  As discussed, the Notice indicates only that plaintiff alleged

discrimination on the basis of "Age" and "Retaliation"; the boxes were left blank for disability

discrimination and "other" discrimination.  *See* defendant's Exh. 22.  Yet, on the Questionnaire

that plaintiff completed, in response to the question, "What is the reason (basis) for your claim of

employment discrimination?," plaintiff clearly checked "Age," "Disability," and "Retaliation."

*See* plaintiff's Exh. D.  Plaintiff's contentions in her Questionnaire are dispositive, despite the

failure of the EEOC to communicate accurately to defendant the basis of plaintiff's claims.  "If

we were to make notice to the employer a determining factor for exhaustion, the plaintiff would

bear the burden of the EEOC's failure in handling a charge.  But it is the EEOC's, not the plaintiff's, duty to provide the charged party with notice….[A] plaintiff should not be penalized for the EEOC's negligence in handling a charge." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1185 (10th Cir. 2007).  Accordingly, defendant's exhaustion argument is unavailing.

II.

As noted, plaintiff has alleged age and disability discrimination, as well as retaliation for taking FMLA-protected leave.  In general, there are "two avenues" at trial by which a plaintiff may prove intentional employment discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'"  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second method is for the plaintiff to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[15]

---

[15] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964.  In *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2349 n.2 (2009), the Supreme Court observed that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas*…is appropriate in the ADEA context." Nevertheless, prior to *Gross*, the burden-shifting methodology endorsed by *McDonnell Douglas* was adapted for use in cases of disability, age, and FMLA discrimination.  *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003) (applying *McDonnell Douglas* framework to claim of disability discrimination in employment under ADA); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (applying *McDonnell Douglas* framework to claim of age discrimination under ADEA); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550-51 (4th Cir. 2007) (applying *McDonnell Douglas* framework to claim of employer retaliation for taking FMLA-

An employee who proceeds under the *McDonnell Douglas* approach must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"[T]o establish a prima facie case of unlawful age discrimination," a plaintiff "must show," by a preponderance of the evidence, "that (1) he [or she] is a member of the protected class; (2) he was qualified for the job and met [his employer's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (citing *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312-13 (1996); *Causey v. Balog,* 162 F.3d 795, 802 & n. 3 (4th Cir. 1998)).

As a person over the age of forty at the relevant time, plaintiff is a member of a protected class under the ADEA.  *See* 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").  With respect to a claim of age discrimination under the ADEA, a plaintiff must ultimately prove "that age was the 'but-for' cause of the challenged employer decision."  *Gross*, *supra*, 129 S.Ct. at 2351.  Put another way, plaintiff must show that she was "doing h[er] job well enough to rule out the possibility that [s]he was fired for inadequate job performance, absolute or relative."  *Warch*, *supra*, 435 F.3d at 515 (citation and

---

protected leave).  I am unaware of any Fourth Circuit cases since *Gross* overruling the cases cited herein.

some internal quotation marks omitted).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show: "(1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of the disability." *Perry v. Computer Sciences Corp.*, 429 F. App'x 218, 220 (4th Cir. 2011) (citing *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 498 (4th Cir. 2005)).

And, to establish discriminatory discharge on the basis of having taken FMLA-protected leave, a plaintiff "must first make a prima facie showing 'that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity.'" *Yashenko, supra,* 446 F.3d at 551 (quoting *Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir. 1998)).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (explaining this principle in the context of a sex discrimination case brought under Title VII). When the defendant meets its burden, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256 (explaining this principle in the context of a sex discrimination case brought under Title VII). Notably, with respect to a claim of age discrimination brought under the ADEA, a plaintiff must ultimately prove "that age was the 'but-for' cause of the challenged employer decision." *Gross*, *supra*, 129 S.Ct. at 2351.

A.

According to UMB, plaintiff was terminated because she "was not meeting the legitimate expectations of her employer."  Memo at 4.  UMB also insists that plaintiff "has not provided any evidence to support a finding that she was meeting the university's expectations for the position as a threshold to maintaining her claims of discrimination…."  Motion at 1.  In this regard, UMB claims that Hartman "never rebutted the repeated and extensive criticisms of her job performance by her supervisor that she was unable to understand and perform the critical functions of her job, was unable to grasp the complexities of the position, and that her errors, especially because of the sensitive nature of work in financial services, were especially concerning."  Memo at 4.

Plaintiff counters that Chow's "repeated biased statements against older workers…call into question the negative assessments…of [her] performance…."  Opposition at 2.  She points to "the biased sentiments attributed to [Chow] by Plaintiff with respect to Plaintiff's age and with respect to the merits of candidates for the subordinate payroll position," arguing that they establish a "discriminatory *animus* undermining assessments supported by the observations of Ms. Chow upon which the Defendant herein relies."  Opposition at 7.  In plaintiff's view, whether Chow's negative assessments were the product of bias is a dispute of material fact precluding summary judgment.  *Id*.

The parties do not cite *any* case law in support of their respective positions in their opening submissions.  Defendant cites a single case, *Ruff v. Target Stores, Inc.*, 226 F. App'x 294 (4th Cir. 2007), in its Reply.

As indicated, in order to establish a prima facie case of discrimination, a plaintiff must show, by a preponderance of the evidence, that, at the time of the adverse employment action, she was meeting her employer's legitimate expectations.  This is so because "considering an

employer's legitimate expectations comports with the purpose of requiring the establishment of a prima facie case—to screen out those cases whose facts give rise to an inference of nondiscrimination, in other words, to eliminate the most common, nondiscriminatory reasons for the employer's conduct." *Warch*, 435 F.3d at 514.

Occasionally, "consideration of the employer's legitimate job expectations at the prima facie stage" requires the court to consider "evidence the employer would typically present in the second stage of the *McDonnell Douglas* framework, that is, where the employer offers the legitimate, non-discriminatory reason for the termination." *Id*. at 515.  Put another way, a plaintiff terminated for poor performance might find herself in the conundrum of having to prove, at the prima facie stage, that her performance was in fact satisfactory in order to proceed to the later stage in the proof scheme, in which she can argue that, although her employer expressed dissatisfaction, it was a pretext for discrimination.

In *Warch*, the Fourth Circuit acknowledged that it was "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima face [sic] too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination." *Id*. at 516.  Fourth Circuit precedent is such that "because a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Id*. at 515-16.  As the Fourth Circuit has said, "To require otherwise would turn the plaintiff's burden at the prima facie stage into a mere burden of production…." *Id*. at 516.  It is, then, the perception of the employer that is relevant in determining whether plaintiff was meeting his employer's legitimate expectations at the time he was terminated. *See Hawkins v. PepsiCo, Inc*., 203 F.3d 274, 280

(4th Cir. 2000) ("'It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'") (citation omitted).

However, "where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'" *Warch*, 435 F.3d at 517. And, at the prima facie case stage, a "plaintiff's burden is 'not onerous.'" *Id.* at 515 (quoting *Burdine, supra,* 450 U.S. at 252). The *Warch* Court relied on "the flexibility of the *McDonnell Douglas* inquiry" to "protect[] plaintiffs" from the conundrum described above. *Id.* at 517. It cited *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 611 (4th Cir.1999), for the proposition that "the *McDonnell Douglas* framework should not be applied in a 'rigid, mechanized, or ritualistic' manner," and *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir. 1985), for the proposition that the *McDonnell Douglas* framework is "less useful" in the context of an adverse action against an employee than in the context of hiring. *Warch,* 435 F.3d at 517. These considerations are pertinent "to the question of whether [plaintiff] has produced sufficient evidence from which a jury could conclude that [Hartman] met [UMB's] legitimate job expectations." *Id.*

It is clear that Chow's many emails reflect her dissatisfaction with Hartman's performance. But, as noted, defendant merely appended the emails to the Motion, without describing the content or their significance in the Memo. In the emails, for example, Chow asserts that on at least one occasion plaintiff failed to follow procedure. Yet, it is not clear what procedure Hartman was to follow, or the extent to which she actually deviated from the procedure, if at all. And, in her affidavit, Hartman insists that she was subjected to false and overblown criticism. *See* plaintiff's Exh. A. Plaintiff's performance review from Chow in May

2008 notes that Chow obtained a negative assessment of plaintiff from plaintiff's former supervisor, Leach.   But, Leach's alleged hearsay comment to Chow directly contradicts plaintiff's account, creating a dispute of material fact.

Although Hartman did not address in her brief the incidents cited by UMB that were the subject of Chow's criticism, resting instead on the generalized assertions in her Declaration, the burden is on *defendant* to demonstrate that "there is no genuine dispute as to any material fact…." Fed. R. Civ. P. 56(a).  A reasonable jury could find that the standards defendant claims Hartman failed to meet were a pretext for discrimination, or were unreasonable or illegitimate, such that, for the purpose of establishing a prima facie case, Hartman's performance was satisfactory.

As indicated, Hartman's age put her in a protected class with regard to the ADEA.  *See* 29 U.S.C. § 631(a).  She alleges, for example, that, due to her FMLA-protected medical leave in January, February, and March of 2008, she was "unable to receive the additional training that the position required," Hartman Dec. ¶ 6, a fact that Chow would have known, and that after plaintiff took protected leave and disclosed her age to Chow, Chow "took every opportunity to limit assistance that she had earlier assured that [plaintiff] would receive." *Id.* ¶ 14.  Hartman's emails responding to Chow's criticism frequently express a desire to learn and improve, and frustration with a lack of opportunities to do so.  *See, e.g.,* defendant's Exh. 3, Hartman Email to Chow of July 18, 2008 ("I think something that would help me and something that I would really appreciate would be if Rita and I could sit down and do the error reports together again for a few more pay periods so that I can reinforce and ask more questions as well as take better notes on making the corrections.").   Yet, Chow criticized Hartman when she approached co-workers for help, eventually insisting instead that she only seek help from Chow, whose emails were

increasingly hostile.  *See, e.g.,* defendant's Exh. 17, Chow Email to Hartman of Sept. 17, 2008 (noting that Hartman had been instructed to approach Chow, not Marable, if she had questions).

A jury could also find it relevant that plaintiff had been at UMB in payroll administrative positions for approximately two decades and, according to plaintiff, she had served without incident and with great success.  *See* Hartman Dec. ¶ 3.  Put another way, by the time plaintiff was hired by Chow, she had been a UMB employee for approximately twenty years, and yet she was terminated by Chow within six months of being hired, and after Chow allegedly expressed age-related animus to plaintiff, and arguably criticized plaintiff's FMLA-protected absence from the workplace.

It is also salient that, in her Declaration, Chow failed to address the allegations in the Complaint concerning her alleged age related comments as to plaintiff or S.D.  The Fourth Circuit has indicated that "[d]erogatory remarks may in some instances constitute *direct evidence* of discrimination."  *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  But, it has cautioned that, "to *prove* discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination."  *Brinkley*, 180 F.3d at 608 (internal quotation marks and alteration omitted) (emphasis added).  Plaintiff does not contend that Chow's remarks meet this strict standard.  However, a jury could consider the comments in determining whether plaintiff met her burden under the *McDonnell Douglas* framework. "Combined with the other circumstantial evidence adduced by Plaintiff, the comments could support an inference of age discrimination."  *EEOC v. Enoch Pratt Free Library*, No. RDB-03-2727, 2005 WL 1712393, *10 (D. Md. July 19, 2005).  *See also Burns*, *supra*, 96 F.3d at 733

(holding an age-related remark to be "insufficient to create a genuine issue of fact under the traditional scheme," but observing that "evidence of the weakness of [defendant's] nondiscriminatory reasons bolsters [plaintiff's] ambiguous affirmative proof," *i.e.* the age-related remark).

Defendant has not challenged whether plaintiff has established the other elements of a prima facie case with respect to counts I and II, the age and disability claims.[16]   Specifically, defendant does not dispute that, as a person over the age of forty, with gastric and psychological problems, plaintiff is a member of the classes protected by the ADEA and ADA.   Nor does defendant dispute that plaintiff's termination constituted an adverse action.   Neither party has introduced evidence regarding whether plaintiff was replaced by a younger person, a glaring omission with regard to the ADEA.   Yet, at this juncture, the burden is upon the defendant, who seeks summary judgment.

The same reasons that prompted me to find that a reasonable jury could believe that plaintiff was held to illegitimate standards lead me also to conclude that a reasonable jury could find that defendant's stated grounds of discharge were pretextual.   Notably, defendant does not argue that plaintiff cannot show that defendant's stated, non-discriminatory reason for terminating plaintiff was pretextual.   The establishment of a prima facie case "is never by itself sufficient to permit a plaintiff to escape an adverse summary judgment ruling except in the rare instance when an 'employer is silent in the face of the presumption' it raises."   *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Burdine, supra,* 450 U.S. at 254).   "Even then, of course, as in every employment discrimination case alleging disparate treatment, '[t]he ultimate burden of persuading the trier of fact that the defendant

---

[16] This is not so as to Count III, the FMLA claim, as discussed *infra*, § B.

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"
*Diamond, supra,* 416 F.3d at 318-19 (quoting *Burdine, supra*, 450 U.S. at 253).

The many emails sent by Chow documenting her dissatisfaction with plaintiff's performance suggest that, ultimately, plaintiff may not be able to satisfy her burden to show that she was not fired because of inadequate performance. At this juncture, however, on the basis of the record and the argument, I am not persuaded that defendant has met its burden of proving that there is no genuine dispute as to any material fact with regard to the ADEA and ADA claims.

## B.

With respect to Count III, the FMLA claim, defendant argues that plaintiff "has failed to demonstrate any nexus between use of FMLA and the decision by the university to reject her on probation on October 13, 2008." Memo at 4. In support of its position, defendant argues, in the Reply at 3: "As Plaintiff asserts in her Complaint, she was not out on FMLA while fired. She was out from January to March, 2008….She was terminated in October, 2008."

Plaintiff counters that she has established a "factual nexus" between her use of FMLA leave and the decision to terminate her employment. Opposition at 13. In her view, there is a dispute of material fact as to "[w]hether Ms. Chow's stated references and concerns about Plaintiff's absences encompassed or excluded those authorized and protected occurrences under the FMLA." *Id*. at 7. Hartman argues, *id.* at 13-14:

> [T]he record establishes the date of Plaintiff's leave, such portions of her leave as was covered by FMLA protection, Ms. Chow's concerns about absence and Plaintiff's unavailability, and a decision to terminate that offers and requires no statement of reasons. Under the circumstances, and under the applicable standard affording the non-moving party the benefit of every fair inference, the fair inference from the circumstances is that Ms. Chow's expressed concerns about absences cannot be established as a matter of law to have played no role in the decision to terminate and such of those absences as were subject to FMLA

protection similarly cannot be determined as a matter of law to have played no role in this decision.

Plaintiff's Exhibit C, "Documents [i.e., emails] reflecting Ms. Chow's concerns about Plaintiff's time away from work," hardly constitutes a "smoking gun" as to plaintiff's FMLA claim.  Two of the incidents discussed in the emails included in Exhibit C do not concern FMLA-protected leave, but rather plaintiff's need for time off to move and for job interviews. The third email communication simply notes that plaintiff had called and left Chow a message that she was "taking a 'FMLA day.'"  *Id.*  But, it was presented in the context of an email that was highly critical of plaintiff's performance, and a jury could find that the request to take "a 'FMLA day'" angered Chow, given plaintiff's claim that Chow complained to plaintiff that she "missed too much time."  Hartman Dec. ¶ 14.

UMB argues a lack of temporal nexus between plaintiff's FMLA leave from January to March 2008, and her termination in October 2008.  Reply at 3.  But, it overlooks that, at around the time of plaintiff's termination, she had asked for FMLA leave because of her mental condition.   In particular, she requested FMLA leave from September 15, 2008, through September 19, 2008, and requested thirteen separate instances of one-hour leave, beginning in October 2008.  *See* defendant's Exh. 15.  She was terminated less than a month later.

"Temporal proximity between the employer's adverse employment action and the employee's exercise of her rights under the FMLA may reasonably support an inference that the action was taken in violation of the FMLA."  *Glunt v. GES Exposition Servs., Inc.,* 123 F. Supp. 2d 847, 871 (2000).  Put another way, "While evidence as to the closeness in time 'far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.'"  *Yashenko*, *supra*, 446 F.3d at 551 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)).

In addition, defendant argues: "[S]ince Defendant has offered a legitimate non-discriminatory reason for Plaintiff's termination in the extensive documentation of poor performance in this position, the burden under *McDonnell Douglas* shifts back to Plaintiff to establish that UMB's proffered explanation of poor performance is a pretext for FMLA retaliation….No such proof has been provided." Reply at 3.

I agree with plaintiff that there is a dispute of material fact as to "[w]hether Ms. Chow's stated references and concerns about Plaintiff's absences encompassed or excluded those authorized and protected occurrences under the FMLA." Opposition at 7. In light of Chow's alleged comments about plaintiff "miss[ing] too much time" from work, Hartman Dec. ¶ 14, and the temporal connection between plaintiff's requests for FMLA-protected leave and her termination, a reasonable jury could find the discharge was FMLA-related. These disputes preclude summary judgment.

## Conclusion

The Fourth Circuit has "emphasized repeatedly the drastic nature of the summary judgment remedy and…held that it should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case." *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004-05 (4th Cir. 1987). For the reasons stated above, UMB's Motion (ECF 28) is denied. A separate Order follows.


Date: August 14, 2012                                          _____/s/_____
                                                               Ellen Lipton Hollander
                                                               United States District Judge